**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MIRANDA WALLINGFORD; RICHARD WALLINGFORD, *Plaintiffs-Appellants,* | No.21-56292 |
| | D.C. No. 8:21-cv-01412-DOC-KES |
| v. | |
| ROBERT ANDRES BONTA, Esquire, in his official capacity as Attorney General of the State of California, *Defendant-Appellee,* | OPINION |
| and | |
| DOES, 1-10, *Defendant.* | |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted July 15, 2022
Pasadena, California

Filed September 21, 2023

Before: Mark J. Bennett and Daniel P. Collins, Circuit Judges, and Elizabeth E. Foote,[*] District Judge.

Opinion by Judge Bennett;
Dissent by Judge Collins

## SUMMARY[**]

### Mootness

The panel dismissed as moot an action asserting an as-applied challenge to California laws that make it unlawful for any person subject to a civil restraining order issued by a California state court (including temporary restraining orders) to possess firearms or ammunition.

This case arises from a dispute between plaintiffs and their neighbor, which resulted in restraining orders issued against plaintiffs by the California Superior Court. Though plaintiffs were subject to a three-year restraining order when they filed suit, the order expired during the pendency of this appeal, and in January 2023, a California court denied the neighbor's request for an extension. Plaintiffs are once again entitled to possess firearms and ammunition.

The panel rejected plaintiffs' argument that, although they were no longer subject to any firearm restrictions, the case fell

[*] The Honorable Elizabeth E. Foote, United States District Judge for the Western District of Louisiana, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

within the "capable of repetition, yet evading review" exception to mootness. The panel noted that this doctrine is to be used sparingly, in exceptional situations, and generally only where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.

The panel held that this case was moot because the relevant restraining orders have expired, a three-year-long restraining order is not too brief to be litigated on the merits, and there was no reasonable expectation that plaintiffs will be subject to the same action again. The mere possibility that a state court would grant another restraining order, after already denying a request for an extension, was speculative and insufficient to constitute a renewed threat of the "same action." Finally, plaintiffs' two-year delay in bringing a lawsuit after surrendering their firearms cut materially against them.

Judge Collins dissented from the majority's dismissal of this case as moot. Given that plaintiffs' neighbor successfully obtained no less than three temporary restraining orders, there was more than a theoretical possibility that plaintiffs will be subjected to a materially similar order in the future. Additionally, it was not clear that complex claims such as this one could be fully resolved within three years.

Proceeding to the merits of the appeal, Judge Collins would hold that the district court erred in concluding that the *Rooker-Feldman* doctrine barred plaintiffs' suit, and would also reject the State's contention that *Younger* requires abstention. He would reverse the district court's dismissal of this action and remand for further proceedings.

## COUNSEL

Mohammad Ali Hamoudi (argued) and Gregory Geist, Assistant Federal Public Defenders, Federal Public Defender's Office, Seattle, Washington, for Defendant-Appellant.

Jonas B. Lerman (argued), Tania M. Culbertson, Michelle Jensen, Nicholas A. Manheim, Teal L. Miller, and Brian Werner, Assistant United States Attorneys; Nicholas W. Brown, United States Attorney; United States Attorney's Office, Western District of Washington, United States Department of Justice, Seattle, Washington; for Plaintiff-Appellee.

## OPINION

BENNETT, Circuit Judge:

Certain California laws make it unlawful for any person subject to a "civil restraining order" issued by a California state court (including temporary restraining orders) to possess firearms or ammunition. *See* Cal. Civ. Proc. Code §§ 527.6(u)(1), 527.9; Cal. Penal Code §§ 27500, 27540, 29825, 30305–06, 30370. Plaintiffs-Appellants Miranda and Richard Wallingford ("the Wallingfords") claim these laws violate the Second Amendment and the Due Process Clause of the United States Constitution as applied to them. Though the Wallingfords were subject to civil restraining orders when they filed their suit, the orders against them have expired, and in January 2023, a California court denied the latest request to extend them. We hold that the Wallingfords' as-applied challenge to the laws is moot.

## I.

The Wallingfords have lived in the same home in Huntington Beach, California for more than 50 years. In February 2013, Jessica Nguyen moved next door. Though the neighbors' relationship was initially cordial, Ms. Nguyen soon began complaining about the melaleuca tree in the Wallingfords' front yard. On June 22, 2018, Ms. Nguyen confronted Richard while Richard was taking out the trash. According to Richard, during this encounter, Ms. Nguyen "dropped to her hands and knees, began screaming, and proceeded to crawl along the concrete sidewalk and pull her hair." Ms. Nguyen then called the police and accused Richard of assaulting her.

On June 25, 2018, Ms. Nguyen petitioned for a civil harassment restraining order against Richard and was granted a temporary restraining order ("TRO") by the Orange County Superior Court. As a result of the TRO, Richard was ordered to surrender his firearms to a California licensed firearms dealer by June 26, 2018. At a merits hearing on August 17, 2018, the state court denied Ms. Nguyen's petition for a restraining order against Richard and dissolved the TRO.

Immediately following the June 22, 2018 incident, the Wallingfords installed security cameras on their property. According to the Wallingfords, in the year that followed, the cameras captured Ms. Nguyen yelling racial epithets, making violent threats, and entering the Wallingfords' property to pour bleach on the melaleuca tree. On June 17, 2019, Miranda filed her own petition for a civil harassment restraining order against Ms. Nguyen. The petition was granted, and the state court issued a TRO against Ms. Nguyen on June 18, 2019.

Ms. Nguyen then filed new petitions for restraining orders against both Miranda and Richard on September 5, 2019, claiming the cameras on the Wallingfords' property were invading her privacy. The court granted the TROs Ms. Nguyen sought, and the Wallingfords surrendered their firearms to a California licensed firearms dealer on September 6, 2019.

On November 1, 2019, the state court granted Miranda a three-year restraining order against Ms. Nguyen, while also granting Ms. Nguyen three-year restraining orders against both Wallingfords. Because of the restraining orders issued against them, the Wallingfords were prohibited from possessing firearms and ammunition. The Wallingfords did not seek to modify, terminate, or appeal the restraining orders, nor did they raise any constitutional claims in state court.

On August 30, 2021, almost two years after the first of the 2019 restraining orders was issued against the Wallingfords, they filed suit against the California Attorney General, claiming that "California's complete restriction on firearm or ammunition possession and acquisition by any person subject to a civil restraining order, regardless of the basis for the order, is unconstitutional *as applied* to Plaintiffs." The district court dismissed the suit on October 28, 2021, and the Wallingfords appealed. On appeal, we submitted this case after oral argument on July 15, 2022.

Months passed. While the appeal was pending, the restraining orders expired.[1] Ms. Nguyen sought to renew her

---

[1] There is some dispute as to whether the restraining orders expired in November 2022 or January 2023. As the dissent notes, on November 1,

restraining orders, but on January 17, 2023, the state court denied her attempt, and the restraining orders were not renewed. There are presently no civil restraining orders against the Wallingfords; they are once again entitled to possess firearms and ammunition and have been since at least January 2023.

## II.

The constitutional requirement that federal courts resolve "only actual, ongoing cases or controversies" applies "through all stages of federal judicial proceedings, trial and appellate." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). "[I]t is not enough that a dispute was very much alive when suit was filed." *Id.* For federal courts to retain jurisdiction, the parties in a dispute "must continue to have a personal stake in the outcome of the lawsuit." *Id.* at 478 (cleaned up). "A case that becomes moot at any point during the proceedings is no longer a 'Case' or 'Controversy' for purposes of Article III, and is outside the jurisdiction of the federal courts." *United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1537 (2018) (internal quotation marks and citation omitted). "Mootness is a question of law," *ASW v. Oregon*, 424 F.3d 970, 973 (9th Cir. 2005), and federal courts must consider mootness *sua sponte*, *NASD Dispute Resolution,*

---

2022, Ms. Nguyen filed a motion to renew and extend her restraining orders, and while her requests were pending, "the state court appears to have temporarily extended the restraining orders, keeping them in place until the [January 2023] merits hearing." Dissent at 29. In their supplemental brief on mootness filed November 18, 2022, the Wallingfords represented that "the initial restraining order expired by its terms on November 1, 2022." But regardless of whether Ms. Nguyen's restraining orders expired in November 2022 or January 2023, there is no dispute that they are no longer in force and haven't been for more than seven months.

*Inc. v. Judicial Council*, 488 F.3d 1065, 1068 (9th Cir. 2007).

While the Wallingfords admit that they are no longer subject to any firearm restrictions, they argue that this case falls into the "capable of repetition, yet evading review" exception to mootness.**[2]** We first note that this doctrine is to be used sparingly, only in "exceptional situations," "and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality," *Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983). It "applies where (1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *See Fed. Election Comm'n v. Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007) (cleaned up). The plaintiff carries the burden of demonstrating the exception applies, *Dep't of Fish & Game v. Fed. Subsistence Bd.*, 62 F.4th 1177, 1181 (9th Cir. 2023), including showing that there is a reasonable expectation that he will once again face the challenged activity, *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1209 (9th Cir. 2021).

We find the exception inapplicable here. This case is moot because the relevant restraining orders have expired, a three-year-long restraining order is not too brief to be litigated on the merits, and there is no reasonable expectation that the Wallingfords will be subject to the "same action" again. And even were this case capable of repetition, yet

---

[2] The Wallingfords also argue that the "voluntary cessation" exception to mootness also applies. But as the State argues, "[t]he 'voluntary cessation' doctrine does not apply here because no party voluntarily ceased conduct that is challenged in this matter."

evading review, the Wallingfords' two-year delay in suing cuts materially against them.

## A. A Three-Year-Long Restraining Order Does Not Evade Review

At the time they filed suit, the Wallingfords were subject to three-year restraining orders and had been subject to brief TROs[3], all carrying firearm restrictions. They challenged these restrictions as unconstitutional as applied to them. In assessing whether an action is of "inherently limited duration" in order to be considered "too short to be fully litigated prior to cessation or expiration," courts tend to look at cases by type rather than individual circumstances. *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 836 (9th Cir. 2014) (cleaned up). This is "because the 'capable of repetition, yet evading review' exception is concerned not with particular lawsuits, but with classes of cases that, absent an exception, would *always* evade judicial review." *Id.* Under our precedent, restraining orders lasting three years do not qualify as too brief to be sufficiently litigated on the merits.

Though there is no bright-line rule, when assessing the classes of cases inherently limited in duration, actions lasting more than two years are frequently considered long enough to be fully litigated prior to cessation, while actions lasting less than two years are considered too short. *Compare Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2012) (en banc) (actions lasting "only one or two years" evade review), with *Hamamoto v. Ige*, 881

---

[3] We do not discount that even a "brief" deprivation of constitutional rights is still a significant deprivation.

F.3d 719, 722–23 (9th Cir. 2018) (action lasting two years and five months sufficiently long).[4]

The restraining orders at issue in this case lasted for three years—beyond the line we drew in *Hamamoto*. Accordingly, our precedent suggests that three-year restraining orders do not "evade review," even if the restraining orders at issue here have evaded the review of our court. Indeed, as the dissent identifies, it appears that Ms. Nguyen may have received a temporary extension of her restraining orders between November 1, 2022 and January 17, 2023. Dissent at 29. If this is the case, the Wallingfords had three years *and* two months to fully litigate the constitutionality of the firearms ban they were subject to during the pendency of Ms. Nguyen's restraining orders. If Ms. Nguyen were to receive a similar restraining order in the future and the Wallingfords were to promptly sue, such a proceeding would not evade our review.[5]

---

[4] In *Johnson v. Rancho Santiago Community. College District*, 623 F.3d 1011 (9th Cir. 2010), we noted that "this litigation demonstrates that three years is too short for us or the Supreme Court to give [a] case full consideration;" but that was because the case had "already been pending for nearly six and a half years." *Id.* at 1019. Indeed, in Johnson, litigation took "over three years to reach us, and the Supreme Court has not yet had a chance to consider it." *Id.* In the instant case, the district court issued its order dismissing the Wallingfords' Complaint 59 days after the Complaint was filed. Oral argument before our Court occurred less than eight months later. This circumstance is closer to the expedited timeline of *Hamamoto* than the sluggish progression of *Johnson*.

[5] We do not discount that there would be insufficient time to litigate the constitutionality of a firearm ban in a *new TRO*. But the Wallingfords were not subject to TROs when they filed their as-applied challenge.

### B. The Wallingfords Failed to Seek Prompt Relief

Of course, though the restraining orders at issue arguably lasted for more than three years, the Wallingfords filed their lawsuit only a little over one year before the orders were set to expire—a substantial delay considering their three-year duration. "A party may not profit from the 'capable of repetition, yet evading review' exception where through his own failure to seek and obtain prompt relief he has prevented an appellate court from reviewing the trial court's decision." *Protectmarriage.com*, 752 F.3d at 837 (cleaned up). The exception is "designed to apply to situations where the type of injury involved inherently precludes judicial review, not to situations where the failure of parties to take certain actions has precluded review as a practical matter." *Bunker Ltd. P'ship v. United States*, 820 F.2d 308, 311 (9th Cir. 1987).[6]

Had the Wallingfords filed suit shortly after becoming the subjects of the restraining orders issued, under our precedent, they would have had sufficient time to litigate this appeal before it became moot. Instead, they waited almost two years after surrendering their firearms on September 6, 2019 before filing suit on August 30, 2021. All else being the same, had the Wallingfords sued much more promptly, we could have reached the merits of their appeal before the

---

[6] Additionally, our court has previously recognized prudential, in addition to jurisdictional, concerns underlying mootness. *See Wildwest Inst. v. Kurth*, 855 F.3d 995, 1002 n.11 (9th Cir. 2017) (noting "the practical concern that the federal courts' limited resources should not be wasted on issues that do not need decision"). Even were the "capable of repetition, yet evading review" exception possibly viable, the Wallingfords' delay in filing counsels against our applying it here.

restraining orders expired.[7]    In other words, the Wallingfords' yearslong failure to take action "precluded review as a practical matter," not as a matter of course. *Bunker Ltd. P'ship*, 820 F.2d at 311.

## C.   The Restraining Orders Have Expired and The State Court Has Already Rejected Ms. Nguyen's Request to Extend Them

Moving from "evading review" to "capable of repetition," there is no "reasonable expectation" or "demonstrated probability" that the Wallingfords *will* be subject to the "same action again." *Wisconsin Right to Life*, 551 U.S. at 462–63 (internal quotations omitted).    The Wallingfords argue that "nothing bars Nguyen from filing any number of additional restraining order applications— again triggering the automatic firearms prohibition."  Both the Wallingfords and the dissent argue that Ms. Nguyen's history of filing for restraining orders against the Wallingfords creates a reasonable expectation that more restraining orders will be entered, and that such restraining orders will implicate the same legal issue presented here. Dissent at 33–39.

The Supreme Court has held that "reasonable expectation" in this context is somewhere short of "demonstrably probable" or "more probable than not." *Honig v. Doe*, 484 U.S. 305, 318 n.6 (1988).  The fact that "nothing bars Nguyen" from filing a new petition for a restraining order does not constitute a reasonable

---

[7] As it was, we *could* have reached the merits before the restraining orders expired.  We held oral argument on July 15, 2022.  The restraining orders expired in either November 2022 or January 2023.

expectation that the Wallingfords will be subject to the same action.

Even if there existed a reasonable expectation that Ms. Nguyen, who has not (to our knowledge) sought a restraining order in the more than seven months following the January 17, 2023 hearing, will again file such a petition, merely *filing* a request for a restraining order does not automatically trigger the firearm prohibition under section 527.6. A court action *granting* a TRO triggers the prohibition. *See* Cal. Civ. Proc. Code § 527.6(u)(1) ("A person subject to a protective order issued pursuant to this section shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect"). Any assumption that the state court *will* grant Ms. Nguyen a new TRO after rejecting her extension request is speculative, and therefore "not a sufficient basis on which a court can conclude that a reasonable expectation of recurrence exists." *Brach v. Newsom*, 38 F.4th 6, 14 (9th Cir. 2022) (en banc).[8]

The dissent argues that it is not merely possible, but probable enough to meet the standard that Ms. Nguyen will file for and subsequently receive another restraining order against the Wallingfords because she has already managed to receive a temporary restraining order by "re-asserting claims that had already been rejected on the merits." Dissent at 37. However, we take a different view of the facts. Though "past wrongs are evidence bearing on whether there

---

[8] It is additionally speculative to assume, as the dissent does, that such a petition will be meritless and granted nonetheless. Dissent at 36–38. Just as the Supreme Court has "consistently refused to conclude that the case-or-controversy requirement is satisfied by the possibility that a party will be prosecuted for violating valid criminal laws," we refuse to assume that state courts will grant meritless petitions. *See United States v. Sanchez-Gomez*, 138 S. Ct. 1532, 1541 (2018) (cleaned up).

is a real and immediate threat of repeated injury," the "the prospect of future injury" requires a different lens. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974). Indeed, if past conduct alone were sufficient to create likely future injury, "virtually any matter of short duration would be reviewable." *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam).

In *Brach v. Newsom*, we held that plaintiffs' challenge to the state's prohibition on in-person instruction during the early part of the COVID-19 pandemic was mooted by the expiration of those policies, and neither the voluntary cessation doctrine nor the capable of repetition, yet evading review doctrine applied. 38 F.4th at 9, 12–15. In addressing whether the COVID-19 shutdowns were capable of repetition, we found "no 'reasonable expectation' that California will once again" restrict in-person instruction because "[t]he challenged orders have long since been rescinded, the State is committed to keeping schools open, and the trajectory of the pandemic has been altered by the introduction of vaccines . . . and expanded treatment options." *Id.* at 15. In short, circumstances change, and when circumstances change, it is not reasonable to expect simple repetition of past actions.

Likewise here. There is no doubt that 2018 and 2019 were difficult years for the Wallingfords. But the only post-restraining order contacts between the Wallingfords and Ms. Nguyen contained in our record are as follows: on November 1, 2022, Ms. Nguyen sought to extend her restraining orders; on January 17, 2023, the state court denied her attempt; and at the January 2023 hearing, Ms. Nguyen allegedly said, "You are not going to get away with this." This does not remotely equal the likelihood of a new restraining order filing, followed by a grant.

Finally, the Wallingfords have not shown that any new restraining order issued against them would constitute the "same action" in a way that implicates the constitutional challenges outlined in their Complaint. Though plaintiffs need not allege "repetition of every 'legally relevant' characteristic of an as-applied challenge–down to the last detail," in order to show they will be subject to the "same action again," subsequent violations must be "materially similar" to relevant past violations in order to constitute the same action. *Wisconsin Right To Life*, 551 U.S. at 462–63. The same action requires "the deprivation of . . . rights that gave rise to" plaintiffs' suit. *Honig*, 484 U.S. at 318.

We agree that although the Complaint is specific to the positioning of the Wallingfords' security cameras, "the gravamen of the Wallingfords' Second Amendment challenge is that they were subjected to a statutorily automatic prohibition on firearms possession without any predicate finding that they had 'posed a danger to any person or the public.'" Dissent at 38. However, while the dissent argues that the same injury would occur in a circumstance in which the Wallingfords were subject to an automatic prohibition on firearms "without any predicate finding" of dangerousness, Dissent at 38, the dissent reads the Complaint broadly. We disagree that a hypothetical future case in which the state court found that the Wallingfords were dangerous or in violation of the law (but was not required by law to make such a finding) would constitute the "same injury" as alleged in the Complaint.

The Wallingfords do not allege that the California statutory scheme restricting firearms is facially unconstitutional. Almost the opposite: the Complaint concedes that "[p]rohibiting access to arms for individuals subject to a restraining order may very well pass

constitutional muster in a variety of instances." However, it continues to allege that a firearm prohibition is unconstitutionally excessive in this case because the California court "**made no finding** that Plaintiffs had broken any law with the positioning of their cameras. **Nor did it make any finding** that Plaintiffs posed a danger to themselves, any other person, or the public." The Complaint alleges that the California laws:

> cannot be constitutionally enforced to deny Plaintiffs access to firearms and ammunition merely as a result of a complaint by a neighbor about the positioning of security cameras that Plaintiffs had a third party install on their property in response to documented hostile actions by that neighbor—which actions a California superior court confirmed constituted "harassment" under California law—and that Plaintiffs voluntarily removed once they learned of the neighbor's objection.

Again, while it would be too restrictive to limit our understanding of the Complaint to issues related only to the Wallingfords' security cameras, the deprivation of rights alleged is based on restrictions on firearm possession without a predicate finding that the Wallingfords pose a danger to any person or the public. A hypothetical future restraining order based on a finding that the Wallingfords were, indeed, dangerous would not fit within the confines of the Complaint. Accordingly, for there to exist a live controversy constituting the "same action," as alleged in the Complaint, Ms. Nguyen would need to file for a TRO and/or restraining order and be granted one, with the state court

granting the restraining order without finding the Wallingfords were dangerous. The dissent suggests that the mere absence of a requirement that such a predicate finding be made is sufficient for a hypothetical future restraining order to constitute the "same action." Dissent at 37–38. But the injury specified in the Complaint is that the state court *made no* finding as to the Wallingfords' dangerousness or lawbreaking, not that the state court was *not required to make any* findings as to dangerousness or lawbreaking. Because a new restraining order could be based on a finding that the Wallingfords posed a danger, thus obviating the Complaint's concern, the mere possibility of a new restraining order is not sufficient to constitute a renewed threat of the "same action."

## III.

Let us be clear. We do not discount the harm the Wallingfords appear to have suffered. But "[t]he basic question in determining mootness is whether there is a present controversy as to which effective relief can be granted." *NW. Env't. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir. 1988). It has been more than seven months since the Orange County Superior Court denied Ms. Nguyen's most recent request to extend her restraining orders, and to our knowledge, there have been no further requests. The Wallingfords have simply not shown that this case is one of the "exceptional situations" warranting the application of the "capable of repetition, yet evading review" doctrine. *Lewis*, 494 U.S. at 481.

\* \* \*

For these reasons, the appeal is **DISMISSED**.[9] [10]

---

[9] The default rule when an appeal becomes moot is not vacatur, it is dismissal. *See U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 23–27 (1994). Though there are exceptions to that rule when an appeal becomes moot through "circumstances not attributable to the parties," or "unilateral action of the party who prevailed in the lower court," *Arizonans for Official English v. Arizona*, 520 U.S. 43, 71 (1997) (internal quotation marks and citations omitted), this case does not present such a circumstance. Indeed, it is the Wallingfords' "burden, as the party seeking relief from the status quo of the appellate judgment, to demonstrate not merely equivalent responsibility for the mootness, but equitable entitlement to the extraordinary remedy of vacatur." *Bancorp*, 513 U.S. at 26. They have not done so. Accordingly, as the Wallingfords' delay contributed to our finding of mootness, and as the district court order below dismissed the case, we simply dismiss the appeal. The parties shall bear their own costs.

[10] The Wallingfords' unopposed motions to take judicial notice (Dkt. Nos. 32, 46) are GRANTED.

COLLINS, Circuit Judge, dissenting:

After becoming involved in a rancorous dispute with their next-door neighbor, Jessica Nguyen, about a tree on their property, Miranda and Richard Wallingford installed security cameras to record any alleged misbehavior by Nguyen near their property line. The cameras did manage to document harassing behavior by Nguyen, and the Wallingfords secured a restraining order against Nguyen from a California state court based in part on that evidence. But the state court also concluded that the cameras had recorded too much of Nguyen's property and therefore invaded Nguyen's privacy rights. On that limited basis, the court also granted Nguyen's petition for restraining orders against the Wallingfords. Under a series of inter-related California statutory provisions, the issuance of such a restraining order, on any grounds, automatically triggers a prohibition on the possession of firearms by the person restrained. By statute, this prohibition is recited on the mandatory standard form that courts must use in issuing such restraining orders, and any violation of the prohibition is a criminal offense. Accordingly, upon the issuance of the restraining order against them, the Wallingfords became automatically subject to this prohibition on firearms possession.

The Wallingfords thereupon filed this suit in federal court, alleging that, as applied to them, California's statutory regime for *automatically* prohibiting firearms possession by any person subject to a restraining order—including someone who merely had obnoxiously-positioned security cameras—violates their rights under the Second and Fourteenth Amendments. Without addressing the merits of these claims, the district court dismissed this federal action on the ground that it amounted to a forbidden de facto appeal

of the state court's restraining order, in violation of the *Rooker-Feldman* doctrine.

The majority today dismisses the appeal the ground that "[t]his case is moot because the relevant restraining orders have expired," and "there is no reasonable expectation that the Wallingfords will be subject to the 'same action' again." Opin. at 8. I disagree and respectfully dissent. Because this case presents a live controversy and the *Rooker-Feldman* doctrine does not bar the Wallingfords' claims, I would reverse the district court's judgment and remand for consideration of the merits of the Wallingfords' suit.

**I**

The backdrop for this case is California's statutory regime for obtaining restraining orders against harassment, and so I begin with an overview of the relevant statutory provisions before turning to the specific facts of this dispute.

**A**

To protect each "individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution," the California Legislature enacted Code of Civil Procedure § 527.6, which provides for "expedited injunctive relief to victims of harassment." *Brekke v. Wills*, 23 Cal. Rptr. 3d 609, 619 (Ct. App. 2005) (simplified). Specifically, § 527.6 provides that "[a] person who has suffered harassment . . . may seek a temporary restraining order and an order after hearing prohibiting harassment." CAL. CODE CIV. PROC. § 527.6(a)(1). "Harassment" is defined as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." *Id*.

§ 527.6(b)(3). "The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner" seeking such injunctive relief. *Id*.

A temporary restraining order under § 527.6 "may be issued with or without notice, based on a declaration that, to the satisfaction of the court, shows reasonable proof of harassment of the petitioner by the respondent, and that great or irreparable harm would result to the petitioner." CAL. CODE CIV. PROC. § 527.6(d). A hearing must subsequently "be held on the petition," generally within 21–25 days after the court rules on the request for a temporary restraining order. *Id*. § 527.6(g). In connection with such a hearing, the "respondent" who is sought to be restrained "may file a response that explains, excuses, justifies, or denies the alleged harassment, or may file a cross-petition." *Id*. § 527.6(b)(5), (h). "At the hearing, the judge shall receive any testimony that is relevant, and may make an independent inquiry." *Id*. § 527.6(i). "If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." *Id*. Once such an "order after hearing" has been issued, it "may have a duration of no more than five years, subject to termination or modification by further order of the court either on written stipulation filed with the court or on the motion of a party." *Id*. § 527.6(j)(1). "The order may be renewed, upon the request of a party, for a duration of no more than five additional years, without a showing of any further harassment since the issuance of the original order," but any such renewal remains subject to the same power of the court to modify or terminate the order upon stipulation or motion. *Id*.

Section 527.6 contains the following subdivision (u), which generally prohibits firearm ownership by a person who is the subject of either a temporary restraining order or an order issued after a hearing under that section:

> (u) (1) A person subject to a protective order issued pursuant to this section shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect.
>
> (2) The court shall order a person subject to a protective order issued pursuant to this section to relinquish any firearms the person owns or possesses pursuant to Section 527.9.
>
> (3) A person who owns, possesses, purchases, or receives, or attempts to purchase or receive, a firearm or ammunition while the protective order is in effect is punishable pursuant to Section 29825 of the Penal Code.

*See* CAL. CODE CIV. PROC. § 527.6(u).

As stated in § 527.6(u)(2), the relinquishment procedure and related details concerning firearm ownership and possession are set forth in § 527.9. That section provides that, upon issuing a protective order under § 527.6, the court "shall order" the restrained person to "relinquish any firearm" that is in or subject to "that person's immediate possession or control, within 24 hours of being served with the order, either by surrendering the firearm to the control of local law enforcement officials, or by selling the firearm to a licensed gun dealer." CAL. CODE CIV. PROC. § 527.9(b);

*see also* CAL. PENAL CODE § 29830(a) (allowing prohibited
person to transfer firearms to a licensed dealer).  Section
527.9 further provides that "[t]he restraining order requiring
a person to relinquish a firearm . . . shall state on its face that
the respondent is prohibited from owning, possessing,
purchasing, or receiving a firearm while the protective order
is in effect" and that any firearm the person owns or
possesses shall be relinquished.  CAL. CODE CIV. PROC.
§ 527.9(d).

Section 527.6 further instructs the California Judicial
Council to develop mandatory forms for the issuance of
protective orders under § 527.6.  *See* CAL. CODE CIV. PROC.
§ 527.6(x)(1).  A related provision of the Penal Code states
that the "Judicial Council shall provide notice on all
protective orders issued within the state that the respondent
is prohibited from owning, possessing, purchasing,
receiving, or attempting to purchase or receive a firearm
while the protective order is in effect" and that such orders
"shall also state" that the respondent must relinquish any
"firearm owned or possessed by [that] person."  *See* CAL.
PENAL CODE § 29825(d).    Accordingly, the pertinent
standard forms issued by the Judicial Council for such
temporary restraining orders (Form CH-110) and orders
after a hearing (Form CH-130) both contain language
expressly reciting the prohibitions on firearm ownership and
the accompanying relinquishment obligations that are set
forth in § 527.6 and § 527.9.

As noted in § 527.6(u)(3), California law makes it a
crime for a person to own, possess, purchase, or receive a
firearm "knowing that the person is prohibited from doing
so in any jurisdiction by a temporary restraining order or
injunction issued pursuant to Section 527.6."  *See* CAL.
PENAL CODE § 29825(a), (b).  The penalty for a violation of

these provisions is "imprisonment in a county jail not exceeding one year, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine," except that, for a violation involving purchase or receipt, imprisonment "in the state prison" is also authorized. *Id*. § 29825(a). An additional provision of the Penal Code generally prohibits any person subject to these firearm prohibitions from owning or possessing "any ammunition or reloaded ammunition." *Id*. § 30305(a)(1). The Penal Code also contained corresponding provisions forbidding sales or delivery of firearms or ammunition to persons subject to these prohibitions. *See id*. §§ 27500, 27540, 30306, 30370.

**B**

Because the district court dismissed this case for lack of subject matter jurisdiction based on the State's facial challenge to the jurisdictional adequacy of the complaint, I take the well-pleaded allegations of that complaint as true and draw all reasonable inferences in favor of Plaintiffs. *Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017). Like the district court, this court may also consider matters subject to judicial notice, including the files of the state court proceedings that led to the restraining orders against Plaintiffs. *See id*.; *see also Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001) (stating that records of court proceedings may be judicially noticed, but not necessarily "for the truth of the facts recited therein"). Applying those standards, I take the following facts as true.

**1**

The Wallingfords have been married and have lived together in their Huntington Beach home for more than 50 years. In 2013, they began encountering issues with a new next-door neighbor, Jessica Nguyen. At first, the

Wallingfords and Nguyen had a disagreement over a tree on
the Wallingfords' front lawn that was near the property line
and that Nguyen complained littered her front yard with
leaves.  Nguyen asked the Wallingfords to remove the tree,
but they refused.  The Wallingfords contend that, over the
ensuing years, Nguyen would sometimes collect the leaves
that fell on her property and dump them onto the
Wallingfords' property.

On June 22, 2018, Richard Wallingford ("Richard") and
Nguyen had an in-person confrontation over the tree outside
their homes, which led to Nguyen calling 911 and alleging
that Richard had pulled her hair and pushed her.  Richard
denied that he had done so.  Although Richard was arrested
for battery, the City Attorney's Office declined to file
charges.

Three days later, Nguyen filed a petition for a temporary
restraining order against Richard under § 527.6, and that
petition was granted.  On June 26, 2018, Richard complied
with the order's requirement to relinquish any firearms by
transferring his firearms to a licensed gun dealer.    In
anticipation of the subsequent hearing on Nguyen's petition
for a protective order, Miranda Wallingford ("Miranda")
arranged to have three security cameras installed on the
Wallingfords' property "for the purpose of recording
evidence of [Nguyen's] conduct that they could use to
defend themselves in court."  In connection with their
response to Nguyen's petition, the Wallingfords submitted
photographs from one of the security cameras that showed
Nguyen directing actions towards the camera, including
spraying her garden hose at the camera, making angry
gestures with her hand and with tools, and making a clothed
"mooning" gesture at the camera.  At a hearing on August
17, 2018, the state court judge determined that "[t]he only

clear and convincing evidence I have heard here is . . . that there's a lot of animosity by Ms. Nguyen towards her neighbor," and that there was not "clear and convincing evidence that there has been harassment by Mr. Wallingford toward Ms. Nguyen." Accordingly, the court denied Nguyen's petition and dissolved the temporary restraining order against Richard.

The Wallingfords' cameras continued to record Nguyen's conduct, and on May 7, 2019, they captured Nguyen pouring bleach on their tree, dumping items on their property, and making angry gestures toward the camera. The cameras also recorded at least three incidents in which Nguyen made "throat-slitting gestures," in one instance using a "cutting instrument" in doing so. In response to Nguyen's continuing behavior, Miranda Wallingford on June 17, 2019 filed a petition on her own and Richard's behalf seeking a restraining order under § 527.6 against Nguyen. A temporary restraining order was issued the next day, pending a hearing on the petition.

On September 5, 2019, prior to the hearing on Miranda's petition, Nguyen filed two more petitions for restraining orders under § 527.6, one against each of the Wallingfords. In her petition against Richard, Nguyen reasserted her claim that she had been attacked by him in June 2018, but she did not mention that this claim had been the subject of a prior unsuccessful petition. Both of Nguyen's petitions also alleged that the video surveillance conducted by the Wallingfords captured areas of Nguyen's property that were "not in public view," which Nguyen contended amounted to an invasion of privacy. The request for a temporary restraining order against Miranda was denied on the grounds that the alleged video surveillance did not constitute a "course of conduct that seriously alarmed, annoyed, or

harassed" Nguyen and that "caused substantial emotional
distress."    However, a temporary restraining order was
issued on September 5, 2019 against Richard.  That order
stated that service of the order by the sheriff was authorized
because the order was "based on unlawful violence, a
credible threat of violence, or stalking," and that suggests
that the order was issued based on the 2018 incident.
Nonetheless, the order also stated that the temporary
restraining order was issued "as requested" in Nguyen's
petition, which arguably extended to Nguyen's explicit
request in her petition that the cameras be repositioned.  In
light of the restraining order, Richard relinquished his
firearms to a licensed dealer the next day.

     At some point after receiving Nguyen's petition,
Miranda contacted the security company about repositioning
the cameras, but she was told that they "were incapable of
further adjustment."  She consequently asked the company
to "black out the portions of [the] camera's view that
captured any of Jessica Nguyen's property."  In her written
response to Nguyen's petition, Miranda stated that the
cameras had "been adjusted to the extent possible to view
[her own] property and the entire length" of the wall dividing
the two properties.  At the hearing on the petitions, Miranda
testified that the cameras were not physically moved, and
that "tech support" with the camera company instead
"externally limited" the visible range of what was captured
by the cameras.  She testified that the company made this
adjustment fairly quickly and that she could just as readily
"call up tech support again" and have this adjustment "taken
off."  Nguyen testified, however, that she thought that the
direction in which one of the cameras pointed had been
changed.  At the hearing, counsel for Nguyen clarified that
"the way that [Miranda] testified about how the cameras are

currently situated and the way that they are currently viewing the property is acceptable" to Nguyen. Nguyen's counsel nonetheless requested a restraining order to prevent the video company's tech support from changing the cameras back to the way they were before.

On November 1, 2019, the superior court issued minute orders granting all three petitions. In the written explanation contained in these rulings, the court explained that, as to Nguyen's conduct, there was "no legitimate purpose to making a throat-slashing gesture towards Miranda's security cameras, or to mooning the cameras, spraying the cameras with water, or other similar conduct directed towards the cameras." The court also found that there was "no legitimate purpose to throwing leaves, bleach, or other items onto Miranda's property." As to the Wallingfords' conduct, the court found that there was "no legitimate purpose" for "pointing security cameras into private areas [of Nguyen's property] and recording 24 hours per day the actions captured by those cameras." The court noted, however, that "the cameras have since been repositioned such that they point only at areas of the Nguyen's residence in public view, which the court finds acceptable." Based on these findings, the court found that Miranda, Richard, and Nguyen had each established harassment "by clear and convincing evidence," as well as "a reasonable probability future . . . harassment would occur absent a protective order." The minute orders themselves did not mention any firearm-related consequences. However, the minute orders stated that the court "concurrently enters appropriate orders on forms CH-130." As noted earlier, those standard forms, in accordance with statutory directives, explicitly reference the applicable

firearms prohibitions.[1]  The Wallingfords did not appeal the issuance of the restraining orders against them.

The restraining orders against the Wallingfords were originally set to expire on November 1, 2022.  However, restraining orders "may be renewed, upon the request of a party, for a duration of no more than five additional years, without a showing of any further harassment since the issuance of the original order."  CAL. CODE CIV. PROC. § 527.6(j)(1).  On November 1, 2022—the same day Nguyen's restraining orders against the Wallingfords were set to expire—Nguyen filed a motion to modify and extend the restraining orders.  The hearing on Nguyen's motion was originally scheduled for November 23.  But the hearing was continued twice, and while Nguyen's requests for renewal were pending, the state court temporarily extended the restraining orders, keeping them in place until the delayed merits hearing.  *See infra* at 35–36.  The merits hearing eventually took place about two months later, on January 17, 2023.  At that January 17 hearing, the state court rejected Nguyen's request to renew the restraining orders.

**2**

In August 2021, the Wallingfords filed this civil action in the district court against Robert Bonta in his official capacity as the Attorney General of California.  The Wallingfords sought declaratory and injunctive relief against continued enforcement of the firearms ownership prohibition set forth in § 527.6(u) and other related provisions of the California Code of Civil Procedure and

---

[1] Neither side included in the district court record of this case the actual forms CH-130 that were entered by the superior court against Miranda, Richard, and Nguyen.

Penal Code.[2]  In their first cause of action, the Wallingfords
alleged that, as applied to them, the challenged statutory
provisions violated their Second Amendment rights, as made
applicable against the States under the Fourteenth
Amendment.  The complaint's second cause of action
alleged that no "legitimate governmental objective"
supported the statutes' prohibition on firearms ownership by
the Wallingfords and that the resulting deprivation amounted
to a violation of "substantive due process" under the
Fourteenth Amendment.

The State filed a motion to dismiss for lack of subject
matter jurisdiction, arguing that (1) the *Rooker-Feldman*
doctrine barred the district court from asserting jurisdiction;
and (2) alternatively, the district court should abstain under
*Younger v. Harris*, 401 U.S. 37 (1971).  The district court
granted the State's motion to dismiss, relying solely on
*Rooker-Feldman*.  The district court accordingly did not
reach the issue of *Younger* abstention.  The Wallingfords
timely appealed, and this court has jurisdiction under 28
U.S.C. § 1291.

**II**

The majority concludes that "[t]his case is moot because
the relevant restraining orders have expired, a three-year-
long restraining order is not too brief to be litigated on the
merits, and there is no reasonable expectation that the

---

[2] Specifically, the complaint asks the district court to declare that
"California Penal Code sections 29825, 27500, 27540, 30305–30306,
and 30370, and California Code of Civil Procedure sections 527.6(u) and
527.9, are unconstitutional as applied to Plaintiffs" under the Second and
Fourteenth Amendments, and to enjoin the Attorney General and his
agents from enforcing those statutes against the Wallingfords.

Wallingfords will be subject to the 'same action' again."
Opin. at 8. I disagree.

**A**

As a general matter, "[c]laims for injunctive relief
become moot when the challenged activity ceases and the
alleged violations could not reasonably be expected to
recur." *Belgau v. Inslee*, 975 F.3d 940, 949 (9th Cir. 2020)
(citations and internal quotation marks omitted). The
"challenged activity" in this case—*viz*., the criminally-
enforced prohibition on the Wallingfords' possession of
firearms—ceased, for the time being, when the underlying
restraining orders terminated on January 17, 2023. The
question is whether such an allegedly unconstitutional
prohibition could "reasonably be expected to recur." *Id.* If
so, "the established exception to mootness for disputes
capable of repetition, yet evading review," may apply, and
the case would not be moot. *Fed. Election Comm'n v.
Wisconsin Right To Life, Inc.*, 551 U.S. 449, 462 (2007).
That established exception "applies where '(1) the
challenged action is in its duration too short to be fully
litigated prior to cessation or expiration, and (2) there is a
reasonable expectation that the same complaining party will
be subject to the same action again.'" *Id.* (citation omitted).

With respect to the latter requirement, a "reasonable
expectation" of recurrence means "more than a 'mere
physical or theoretical possibility'" that the same action
challenged in the suit will recur. *Dep't of Fish & Game v.
Fed. Subsistence Bd.*, 62 F.4th 1177, 1182 (9th Cir. 2023)
(quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982)). The
"complaining party . . . need not show that there is a
*demonstrated probability* that the dispute will recur." *Hooks
ex rel. NLRB v. Nexstar Broadcasting, Inc.*, 54 F.4th 1101,

1113 (9th Cir. 2022) (emphasis added) (citation omitted). A future action is the "same action" for purposes of this exception if it is "materially similar" to the past wrong; it need not be identical in every respect. *Wisconsin Right To Life*, 551 U.S. at 463. "Requiring repetition of every 'legally relevant' characteristic of an as-applied challenge—down to the last detail—would . . . mak[e] this exception unavailable for virtually all as-applied challenges." *Id.* (citation omitted).

For the "evading review" prong of the exception to apply, "the duration of the challenged action [must be] too short to allow full litigation before it ceases or expires." *Native Vill. of Nuiqsut v. Bureau of Land Mgmt.*, 9 F.4th 1201, 1209 (9th Cir. 2021) (citation and internal quotation marks omitted). For purposes of this exception, "complete judicial review . . . includes Supreme Court review." *Alaska Ctr. for Env't v. U.S. Forest Serv.*, 189 F.3d 851, 856 (9th Cir. 1999). While the precise time window required for "complete judicial review," *id.*, varies by the type of case at issue, more than two years is generally sufficient time to fully litigate a matter, while less than two years is generally not. *Compare Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1018 (9th Cir. 2012) ("We have repeatedly held that similar actions lasting only one or two years evade review."), *with Hamamoto v. Ige*, 881 F.3d 719, 723 (9th Cir. 2018) ("Because we are not convinced that two years and five months is 'almost certain[ly]' inadequate time for a case of this type to receive plenary review by the federal courts, we hold that the 'capable of repetition, yet evading review' exception to mootness does not apply." (citation omitted)).

**B**

In my view, both of the required elements for this mootness exception are satisfied here.

**1**

On this record, there is "more than a 'mere physical or theoretical possibility,'" *Dep't of Fish & Game*, 62 F.4th at 1182 (citation omitted), that the Wallingfords will again be subject to a materially similar order under § 527.6.

As I have explained, the Wallingfords' complaint in this case sought an order enjoining the as-applied enforcement of a set of interlocking provisions that, upon issuance of a restraining order under California Code of Civil Procedure § 527.6, made it a criminal offense for the person restrained to possess firearms or ammunition. The key provision is § 527.6(u), which states, *inter alia*, that "[a] person subject to a protective order issued pursuant to this section shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect." CAL. CIV. PROC. CODE § 527.6(u)(1). Notably, a "protective order issued pursuant to this section" includes *both* "a *temporary* restraining order" and "an order after hearing." CAL. CIV. PROC. CODE § 527.6(a)(1) (emphasis added). The question, then, is whether there is a reasonable expectation that the Wallingfords will be subject to *either* a temporary order under § 527.6 *or* an order issued under that section "after hearing," thereby triggering the statutory criminal prohibition on owning or possessing firearms or ammunition.

As a threshold matter, I agree with the majority that the Wallingfords' conflict with their neighbor Nguyen provides the only possible factual basis for reasonably expecting that

the Wallingfords will be subject to a relevant restraining order in the future. Moreover, the majority does not seriously dispute that it may reasonably be expected that Nguyen will again *file* another petition for a restraining order against the Wallingfords under § 527.6.**³** That point seems amply supported by the Wallingfords: Nguyen has already filed three requests for restraining orders against them, and the Wallingfords have presented evidence that, at the most recent hearing in January 2023, Nguyen turned to them at one point and said, "You are not going to get away with this." But I disagree with the majority's conclusion that there is no reasonable expectation that the California courts will again *grant* Nguyen a materially similar restraining order. The majority's analysis overlooks the fact that Nguyen has successfully sought and obtained no less than three *temporary* state-court restraining orders against the Wallingfords under § 527.6, which automatically subjected them to a criminal prohibition on firearms possession during the relatively short period between the issuance of those temporary orders and the merits hearing a few weeks or months later.

Nguyen filed her first request for a restraining order against Richard Wallingford on June 25, 2018, alleging—falsely, as the state court later concluded—that Richard had physically assaulted her three days earlier, on June 22. The very same day this request was filed, the state court granted a temporary restraining order, thereby requiring Richard to give up his firearms (which he did the next day, June 26). At

---

³ The majority notes in passing that Nguyen has not filed such a petition since the January 2023 expiration of the restraining order, *see* Opin. at 13, but little, if any, weight can be given to that fact, particularly given that we explicitly raised the mootness issue in a November 2022 order calling for supplemental briefing.

a merits hearing a little less than two months later—on August 17, 2018—the state-court judge denied Nguyen's request for an order after hearing, and the court dissolved the temporary restraining order against Richard.

On September 5, 2019, Nguyen again filed petitions for restraining orders against the Wallingfords. Nguyen based her petition against Richard in part on the very same June 22, 2018 allegation of assault that had *already* been adjudicated against her in August 2018. The second set of petitions also referenced "a camera pointed at my front yard," raising an invasion-of-privacy claim. Nguyen's second petition against Richard *again* resulted in a temporary restraining order against Richard, again issued the same day Nguyen filed her petition. That temporary order was scheduled to expire less than a month later, after a merits hearing on September 30, 2019. Richard again complied with the temporary order's requirement to give up his firearms. Unlike Nguyen's first request, which resulted in a merits judgment in the Wallingfords' favor, Nguyen's second request was ultimately successful: as described above, the state court at the second hearing in November 2019 issued long-term restraining orders against the Wallingfords on the basis that the placement of their security cameras violated Nguyen's privacy. The court, however, disavowed any reliance on the alleged June 2018 assault, which had previously been the subject of the August 2018 hearing on Nguyen's first application.

Although the long-term restraining orders against the Wallingfords were set to expire on November 1, 2022, Nguyen *again* requested an extension of the restraining orders at the last minute, and the state court *again* granted temporary extensions of those orders for another two-and-a-half months—until the most recent state-court merits hearing

on January 17, 2023. The majority claims that the November 2019 order, which was set to expire on November 1, 2022, may not have been extended, *see* Opin. at 6 n.1, but the record before us disproves that contention. The materials submitted to this court by the State in connection with the mootness issue specifically note that the state court's order scheduling a hearing on Nguyen's extension request included the statement that "[t]he current restraining order stays in effect until the hearing." Moreover, the January 17, 2023 order states that the "Request to Renew Restraining Order" is "DENIED" *and* that therefore the "order is to expire on 01/17/2023." The record is thus clear that the November 2019 order *was* temporarily extended and that it "expire[d] on 01/17/2023," not on November 1, 2022.**[4]**

In short, Nguyen has successfully caused the California state courts to issue temporary restraining orders—or temporary extensions of long-term restraining orders— against the Wallingfords no less than *three times*. The majority nonetheless says that there is now no reasonable expectation of a recurrence, because the state court rejected Nguyen's most recent request for a long-term extension. *See* Opin. at 13–14. It would be "speculative," according to the majority, to think that the state court would grant even a temporary restraining order to Nguyen after having ruled

---

[4] Indeed, the standard form used for providing notice of a hearing on a request to renew a restraining order comes pre-printed with the above-quoted language keeping the restraining order in effect, and it further states that the restrained person "*must* continue to obey the current restraining order until the hearing." *See Notice of Hearing to Renew Restraining Order (CH-710)*, CAL. COURTS SELF-HELD GUIDE (Jan. 1, 2016), https://selfhelp.courts.ca.gov/jcc-form/CH-710. It thus appears that the California courts automatically grant such further temporary extensions without *any* further showing, and that the court did so here.

against her on the last one.  *Id*. at 13.  But this assertion is refuted by the fact that Nguyen has *already* once before obtained an immediate temporary order *by re-asserting claims that had already been rejected on the merits.*  As noted earlier, the temporary restraining order entered against Richard on September 5, 2019 was based on the same alleged June 2018 assault that had been found to be meritless when the prior request for a long-term order was denied in August 2018.  There is no support in this record for the majority's confidence that the California courts would never issue a temporary restraining order based on a petition filed by a claimant whose previous petition was rejected on the merits.  Not only have the California courts done just that to Richard Wallingford—they did so basis on that claimant's re-assertion of the *very same*, previously rejected, allegations.  Indeed, from what this record reveals, it is reasonably to be expected that the California courts perfunctorily issue temporary orders on the same day that they are requested with only minimal scrutiny and without findings that would be sufficient to support an automatic deprivation of Second Amendment rights.[5]

The majority is also wrong in suggesting that there is no basis to reasonably expect that the Wallingfords would be subject to a further restraining order that is "materially similar."  *Wisconsin Right to Life*, 551 U.S. at 463.  Material similarity must be judged from the perspective of the "legal issue" that is the gravamen of the challenge.  *Hooks*, 54 F.4th at 1114.  Although the specific facts that gave rise to the

---

[5] The record thus refutes the majority's suggestion that we should presume that the California courts will only grant temporary restraining orders under § 527.6 after first making findings that would support what the Wallingfords contend the Second Amendment requires.  *See* Opin. at 13 n.8.

long-term restraining order here involved the positioning of
security cameras, the gravamen of the Wallingfords' Second
Amendment challenge is that they were subjected to a
statutorily automatic prohibition on firearms possession
without any predicate finding that they had "posed a danger
to any person or the public."   Given the reasonable
expectation that Nguyen will file another petition and that
the California courts will grant a temporary order with little
scrutiny and without making predicate findings sufficient to
support an automatic deprivation of Second Amendment
rights, the same legal issue would be presented, even if "a
different constellation of facts" might be involved. *Id*.; *see
also Wisconsin Right to Life*, 551 U.S. at 463 (holding that,
to invoke the capable-of-repetition exception, a plaintiff is
not required to show "repetition of every 'legally relevant'
characteristic of an as-applied challenge—down to the last
detail"). On this record, there is "more than a 'mere physical
or theoretical possibility'" that the Wallingfords will be
subjected to a materially similar temporary order. *Dep't of
Fish & Game*, 62 F.4th at 1182 (citation omitted).

**2**

I also conclude that the Wallingfords have adequately
established that "the challenged action is in its duration too
short to be fully litigated prior to cessation or expiration."
*Wisconsin Right to Life*, 551 U.S. at 462 (citation omitted).

There is no question, and the majority does not dispute,
that the duration of a *temporary* restraining order under
§ 527.6 is "too short to allow full litigation" before the order
"cease[] or expire[]." *Nuiqsut*, 9 F.4th at 1209. The three
temporary restraining orders issued in this matter have lasted
just weeks or months—far too short a time to allow for
"complete judicial review," including "Supreme Court

review," of the orders. *Alaska Ctr. for Env't*, 189 F.3d at
856. Temporary orders issued under § 527.6 thus evade
federal court review, ensuring that the alleged constitutional
violations cannot be adjudicated on the merits.

Although the majority concedes that "there would be
insufficient time to litigate the constitutionality of a firearm
ban in a *new*" temporary restraining order issued under
§ 527.6, *see* Opin. at 10 n.5, the majority claims that this fact
is irrelevant because "the Wallingfords were not subject to
[temporary restraining orders] when they filed their as-
applied challenge." *Id*. The majority's analysis is flawed.
As I have explained, the application of this mootness
exception is not defeated simply by showing, as the majority
has done, that the reasonably expected recurrence of a
violation would arise under "a different constellation of
facts." *Hooks*, 54 F.4th at 1114. What matters is whether
there is a reasonable expectation that the plaintiff will again
be *subject to the challenged restrictions*. Because the
challenged set of statutes that criminally prohibit firearms
possession is equally triggered by a temporary order under
§ 527.6 as by a long-term order, the Wallingfords have
adequately shown that there is a reasonable expectation that
they will be again subject to the challenged statutory
prohibition on firearms possession.

Moreover, the majority is wrong in asserting that three
years is sufficient to fully litigate a case of this sort. Noting
that the Wallingfords "waited almost two years after
surrendering their firearms on September 6, 2019 before
filing suit on August 30, 2021," the majority concludes that,
"[h]ad the Wallingfords sued much more promptly, we could
have reached the merits of their appeal before the restraining
order expired." Opin. at 11–12. But the majority overlooks
the fact that the "appeal" that we would have decided more

quickly is a preliminary appeal about the applicability of the *Rooker-Feldman* doctrine—*not* an appeal addressed to the merits of the underlying Second Amendment issue. Even if the Wallingfords had filed suit earlier and obtained the district court's adverse decision below more quickly, it would likely have taken more than three years to complete: (1) the full resolution of the complex issues raised in this *Rooker-Feldman* appeal, including review by the Supreme Court;[6] (2) the district court proceedings on remand on the merits of the Second Amendment issue; and (3) the full resolution of the Second Amendment appeal, including Supreme Court review.[7] For similar reasons, the result is the same even if we focus on the general *category* of such challenges, as opposed to the specific course that this particular litigation took. *See* Opin. at 9. Given their complexity, the type of claims at issue here are not ones that, as a general matter, we can confidently conclude are likely to be fully resolved, including appeals and Supreme Court review, within three years.

These same considerations negate the majority's suggestion that dismissal of this appeal is independently warranted under the principle that "a party may not profit

---

[6] It is therefore irrelevant whether *this court* could have resolved the merits of this appeal by January 2023. *See* Opin. at 12 n.7. "[C]omplete judicial review . . . includes Supreme Court review,' *Alaska Ctr. for Env't*, 189 F.3d at 856, and there is no chance that that could have been completed by January 2023.

[7] For the same reason, the majority errs in emphasizing that the district court dismissed the case in 59 days. *See* Opin. at 10 n.4. That fact, if anything, cuts the other way—the district court was able to act so quickly only because it decided only *one* of the three issues, and that issue-by-issue approach raises the specter of multiple appeals and associated delays.

from the 'capable of repetition, yet evading review' exception . . . where through his own failure to seek and obtain [prompt relief] he has prevented [an] appellate court from reviewing the trial court's decision." *Protectmarriage.com-Yes on 8 v. Bowen*, 752 F.3d 827, 837 (9th Cir. 2014) (citation omitted); *see* Opin. at 11–12 & n.6. While the Wallingfords' delay in filing suit is not explained in the record, the facts of this case make clear, as I have explained, that that delay did *not* contribute to the mootness that occurred here.  Moreover, it seems inappropriate to apply the *Protectmarriage.com* exception in a situation, such as this one, in which, at least going forward, the factual predicate for invoking the capable-of-repetition doctrine is one "where the type of injury involved inherently precludes judicial review." *Bunker Ltd. P'ship v. United States* (*In re Bunker Ltd. P'ship*), 820 F.2d 308, 311 (9th Cir. 1987); *see also Protectmarriage.com*, 752 F.3d at 837.  The principal basis for applying the doctrine here—which is that the Wallingfords face a reasonable likelihood of being subjected to another temporary restraining order raising similar constitutional concerns—is inherently incapable of surviving over the full course of judicial review.

For the foregoing reasons, I dissent from the majority's dismissal of the case as moot, and I therefore proceed to the merits of the appeal.

## III

"The *Rooker-Feldman* doctrine bars lower federal courts from exercising jurisdiction 'to review the final determinations of a state court in judicial proceedings.'" *Benavidez v. County of San Diego*, 993 F.3d 1134, 1142 (9th Cir. 2021) (citation omitted).  In addition to proscribing review of "an action explicitly styled as a direct appeal," the

*Rooker-Feldman* doctrine also prohibits the lower federal courts from entertaining the "'de facto equivalent' of such an appeal." *Cooper v. Ramos*, 704 F.3d 772, 777 (9th Cir. 2012) (citation omitted). A plaintiff "cannot come to federal court to seek 'what in substance would be appellate review of the state judgment.'" *Benavidez*, 993 F.3d at 1142 (quoting *Johnson v. De Grandy*, 512 U.S. 997, 1005–06 (1994)). This court reviews de novo the district court's determination that this federal suit is, in substance, a de facto appeal of the state court's judgments against the Wallingfords in the protective-order actions brought by Nguyen. *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1139 (9th Cir. 2004).

**A**

In assessing whether this federal action falls within the scope of the *Rooker-Feldman* doctrine, I begin by tracing the Supreme Court's development of the doctrine and the ways in which our court has defined its scope.

"The *Rooker-Feldman* doctrine derives its name from two Supreme Court cases: *Rooker v. Fidelity Trust Company*, 263 U.S. 413 (1923), and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983)." *Benavidez*, 993 F.3d at 1142. The Supreme Court has held that the *Rooker-Feldman* doctrine "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). Because "the Supreme Court has been very sparing in its invocation of the [*Rooker-Feldman*] doctrine," our court has been "careful not

to sweep too broadly" in applying it.  *Cooper*, 704 F.3d at 778.

A proper understanding of *Rooker-Feldman* should begin with *Rooker* and *Feldman* themselves.  *Rooker* involved a federal action seeking "to have a judgment of a [state court] . . . declared null and void" on the ground that it violated the federal Constitution.  263 U.S. at 414–15; *see also Rooker v. Fidelity Trust Co.*, 261 U.S. 114, 115–16 (1923) (dismissing writ of error on direct review of the Indiana Supreme Court's decision and detailing the facts of the state court litigation).  The Court held that the federal district court's entertaining of such an action would amount to "an exercise of appellate jurisdiction" over the state courts.  263 U.S. at 416.  However, only the Supreme Court had been granted such appellate jurisdiction, and "[t]he jurisdiction possessed by the District Courts is strictly original." *Id*.; *see also* 28 U.S.C. § 1257 (current provision granting the Supreme Court jurisdiction to review final state court judgments raising certain federal issues).

In *Feldman*, two applicants to the D.C. Bar unsuccessfully petitioned the D.C. Court of Appeals to grant them waivers from the D.C. bar rule requiring that applicants have graduated from a law school approved by the American Bar Association ("ABA").  *See* 460 U.S. at 464–72.  The two applicants thereafter filed separate suits in federal district court, alleging that the refusal to waive the requirement to attend an ABA-approved school violated the federal Constitution.  *Id*. at 468–73.  The district court dismissed their actions on the ground that the suits amounted to a request to review the D.C. Court of Appeals' judgments, but the D.C. Circuit reversed in an opinion addressing both applicants' cases.  *Id*. at 470–75.  The Supreme Court vacated and remanded.  *Id*. at 488.  The Court agreed that,

"to the extent that [the plaintiffs] sought review in District Court of the District of Columbia Court of Appeals' denial of their petitions for waiver[,] the District Court lacked subject matter jurisdiction over their complaints" under *Rooker*. *Id*. at 482; *see also id*. at 476. But the Court further held that, "[t]o the extent that [the plaintiffs] mounted a general challenge to the constitutionality" of the D.C. bar rule on the grounds that "it creates an irrebuttable presumption that only graduates of accredited law schools are fit to practice law, discriminates against those who have obtained equivalent legal training by other means, and impermissibly delegates the District of Columbia Court of Appeals' power to regulate the bar to the American Bar Association," those claims "do not require review of a judicial decision in a particular case" but simply ask the district court "to assess the validity of a rule promulgated in a non-judicial proceeding." *Id*. at 483–84, 486–87. Accordingly, the district court *did* have jurisdiction over such claims. *Id*. at 487.

The distinction drawn in *Feldman* was further clarified by the Court's decision in *Skinner v. Switzer*, 562 U.S. 521 (2011). There, Skinner, a convicted state prisoner, filed two unsuccessful motions under a Texas statute to obtain post-conviction DNA testing of evidence associated with the underlying crime for which he was convicted. *Id*. at 529. After the Texas Court of Criminal Appeals ("CCA") affirmed the denial of the second motion, Skinner filed a federal action "alleg[ing] that Texas violated his Fourteenth Amendment right to due process by refusing to provide for the DNA testing he requested." *Id*. "Emphasizing 'the narrow ground' occupied" by the *Rooker-Feldman* doctrine, *id*. at 532 (quoting *Exxon Mobil*, 544 U.S. at 284), the Court explained that the distinction drawn in *Feldman* was that "a

*state-court decision* is not reviewable by lower federal courts, but *a statute or rule governing the decision* may be challenged in a federal action." *Id*. (emphasis added). Because Skinner did "not challenge the adverse CCA decisions themselves" and instead "target[ed] as unconstitutional the Texas statute they authoritatively construed," the Court held that his case fell on the permitted side of the line drawn by *Feldman*. *Id*.

In addition to the Supreme Court's distinction between challenging a state court decision and challenging the state statute governing the decision, our court's *Rooker-Feldman* caselaw has drawn a distinction between challenging an error committed *by the state court* and challenging a wrong committed *by a litigant*. For example, in *Kougasian*, we held that the doctrine did not prohibit federal court jurisdiction over the plaintiffs' suit alleging that the defendants had committed extrinsic fraud in securing the dismissal of two state court tort actions against one or more of those same defendants. 359 F.3d at 1137–43. We noted that, as a general matter, *Rooker-Feldman* barred federal district courts from asserting jurisdiction over an action in which the "plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision." *Id*. at 1140 (citation and internal quotation marks omitted). Although the plaintiffs' federal suit in *Kougasian* unquestionably *did* seek relief from the prior adverse state court judgments, we held that the doctrine nonetheless did not apply because the plaintiffs were not "alleg[ing] a legal error by the state court as the basis for that relief." *Id*. at 1140. As we explained:

> Extrinsic fraud on a court is, by definition, not an error by that court. It is, rather, a

> wrongful act committed by the party or
> parties who engaged in the fraud. *Rooker-*
> *Feldman* therefore does not bar subject
> matter jurisdiction when a federal plaintiff
> alleges a cause of action for extrinsic fraud on
> a state court and seeks to set aside a state
> court judgment obtained by that fraud.

*Id*. at 1141.

We applied similar reasoning in rejecting a *Rooker-*
*Feldman* argument in *Maldonado v. Harris*, 370 F.3d 945
(9th Cir. 2004). *Maldonado* involved a provision of
California law that, as applied to commercial buildings such
as Maldonado's, generally forbade billboard advertisements
"unless the advertisement is for products or services offered
on the premises." *Id*. at 948. Maldonado sought a permit
that would allow him to place "off-premises advertising" on
his billboard, but the California Department of
Transportation ("Caltrans") denied the application based on
that provision of the statute. *Id*. After Maldonado posted
such advertisements anyway, he was cited by Caltrans for
doing so, and he lost his administrative challenges to those
citations. *Id*. After Maldonado again persisted in violating
the statute, Caltrans brought a nuisance action against him
and succeeded in obtaining a "judgment against Maldonado"
that "includ[ed] a permanent injunction generally restricting
his ability to post further advertisements on his billboard."
*Id*. Maldonado's appeals of that judgment in state court were
unsuccessful, and subsequently he was twice found to be in
contempt of the injunction. *Id*. Maldonado then filed a
complaint in federal court alleging that the California statute
"violated the First Amendment on its face and as it had been
applied to him and his various advertisements." *Id*. at 949.

His requested relief included "a permanent injunction restraining enforcement of the Act, including any attempts by Caltrans to 'enforce any injunction based upon' the Act." *Id*. The district court found his claims were barred by the *Rooker-Feldman* doctrine, but we reversed. *Id*. at 949–51. Even though Maldonado's complaint explicitly sought "relief from the injunction entered by the state court," we held that *Rooker-Feldman* did not apply because Maldonado was "not alleging as a legal wrong an erroneous decision from the state court." *Id*. at 950. We stated:

> The legal wrong that Maldonado asserts in this action is not an erroneous decision by the state court in the nuisance suit brought against Maldonado by Caltrans, but the continued enforcement by Caltrans of a statute Maldonado asserts is unconstitutional. In other words, Maldonado asserts as a legal wrong *an allegedly illegal act by an adverse party*.

*Id*. (simplified) (emphasis added).

**B**

In light of these precedents, I conclude that *Rooker-Feldman* does not bar the district court from asserting jurisdiction over the Wallingfords' federal suit.

Here, the "legal wrong" that the Wallingfords assert in their federal suit "is not an erroneous decision by the state court" in deciding the issues raised by Nguyen's petitions and the Wallingfords' responses. *Maldonado*, 370 F.3d at 950. In resolving those issues, the state court's minute orders found only that the Wallingfords' use of the security

cameras constituted harassment of Nguyen and that, absent a protective order restraining a recurrence, there was a "reasonable probability" that future harassment might occur. The court specifically reaffirmed that, in deciding Nguyen's petitions, it was excluding all reference to the alleged assault by Richard that had been the subject of the prior restraining order proceedings that were resolved in his favor. The court therefore relied solely on the positioning of the camera and not on any allegation of violence or threats of violence. The Wallingfords do not seek federal court review or rejection of any of these findings. And, unlike the plaintiffs in *Feldman* and *Rooker*, the Wallingfords do not contend that the state court's resolution of any of the issues actually litigated in the state actions is tainted by a federal-law error. *Cf. Feldman*, 460 U.S. at 482 n.16 (noting that one aspect of the plaintiffs' suit challenged the substantive resolution of their waiver applications as being tainted by federal-law error, but also noting that this challenge may not have been properly raised and preserved); *Rooker*, 263 U.S. at 416 (holding that federal suit was "merely an attempt to get rid of the judgment for alleged errors of law committed" by the state courts). Indeed, the trial court's minute orders say nothing about firearms, because neither side raised any issue for the court to decide concerning that subject. *Cf. Maldonado*, 370 F.3d at 948 (noting that no federal issues had been resolved in the state court nuisance litigation that led to an injunction against Maldonado's advertising).

Instead, the Wallingfords' complaint challenges "the validity of [statutes] promulgated in a non-judicial proceeding," *see Feldman*, 460 U.S. at 486–87, and it seeks to block wrongful enforcement of those statutes by strangers to the state proceeding—namely, the Attorney General and those acting in concert with him, *see Maldonado*, 370 F.3d

at 950. Far from challenging the state court's findings, the
Wallingfords have made them the *basis* for their federal
challenge to the relevant California statutes, which they
contend wrongly trigger an automatic deprivation of the
right to own firearms without any regard whatsoever to
individual circumstances. The Wallingfords' contention is
that, after the state court resolved the parties' private dispute
by granting in part and denying in part the relief sought, the
State of California then interposed itself by mandating an
automatic ban on firearms possession, requiring the use of a
standardized form of order that includes the prohibition
decreed by the California Legislature, and making such
possession a criminal offense. *See Maldonado*, 370 F.3d 945
("The legal wrong that Maldonado asserts in this action is
not an erroneous decision by the state court in the nuisance
suit brought against Maldonado by Caltrans, but the
continued enforcement by Caltrans of a statute Maldonado
asserts is unconstitutional."). The Wallingfords' effort to
restrain this alleged wrongful conduct by the Legislature and
by the Attorney General (and those acting in concert with
him) does not call into question the state court's resolution
of *any* issue litigated by the parties in that action.

To be sure, the Wallingfords' challenge to the California
statutes, if successful, would have the collateral effect of
voiding the portions of the state court's final judgments that
contain the legislatively-dictated mandatory language
barring firearms ownership. But as our decisions in
*Kougasian* and *Maldanado* make clear, the mere fact that a
challenge to a party's extrinsic misconduct (as in *Kougasian*)
or to a state statute being wrongfully enforced by state
officials (as in *Maldonado*) would have the effect of voiding
a portion of a state court judgment is not sufficient, without
more, to trigger the *Rooker-Feldman* doctrine. Maldonado's

complaint explicitly sought "relief from the injunction entered by the state court," but we nonetheless held that *Rooker-Feldman* did not apply to *any* portion of his suit because he was "not alleging as a legal wrong an erroneous decision from the state court," but rather "the continued enforcement by Caltrans of a statute Maldonado asserts is unconstitutional." *Maldonado*, 370 F.3d at 950.**[8]** And, as we acknowledged in *Kougasian*, the federal suit there explicitly sought to have the state court judgment voided based on extrinsic fraud and then to have the issues resolved by that judgment be *relitigated* in federal court. *See Kougasian*, 359 F.3d at 1139. Yet we held that *Rooker-Feldman* did not apply because the "legal wrong" that was the gravamen of the suit was not "an allegedly erroneous decision by a state court" but instead the "allegedly illegal

---

[8] This point is confirmed by *Maldonado*'s rejection of Caltrans's reliance on *Feldman*'s comment that the bar of *Rooker-Feldman* extends to those additional federal issues that are raised in the federal suit and that are "inextricably intertwined" with the portion of the suit that is a forbidden de facto appeal. *See Feldman*, 460 U.S. at 486–87. In rejecting Caltrans's argument, we stated:

> Only when there is already a de facto appeal in federal court does the "inextricably intertwined" test come into play: Once a federal plaintiff seeks to bring a forbidden de facto appeal, as in *Feldman*, the federal plaintiff may not seek to litigate an issue that is "inextricably intertwined" with the state judicial decision from which the forbidden de facto appeal is brought.

*Maldonado*, 370 F.3d at 950 (quoting *Noel v. Hall*, 341 F.3d 1148, 1158 (9th Cir. 2003)). We concluded that, because *no* portion of Maldonado's complaint constituted a "forbidden de facto appeal," the "'inextricably intertwined' test does not come into play." *Id*.

act or omission" of another party. *Id*. at 1140 (citation omitted). So too here. The Wallingfords do not assert any error in the state court's resolution of any litigated issue; rather, they challenge the validity of the allegedly unconstitutional statutes that were triggered by the court's ruling and the Attorney General's continued enforcement of those statutes. Under *Kougasian* and *Maldonado*, this suit is not barred by *Rooker-Feldman* even though it would have the collateral effect of voiding a portion of the mandatory form-orders issued by the state court.**[9]** In my view, the district court therefore erred in dismissing this suit under *Rooker-Feldman*.

## IV

The State alternatively contends that even if the district court erred in holding that the *Rooker-Feldman* doctrine barred jurisdiction here, we should nonetheless affirm the judgment on the grounds that *Younger* requires abstention here. That contention is wrong.

## A

"In the main, federal courts are obliged to decide cases within the scope of federal jurisdiction," and "[a]bstention is not in order simply because a pending state-court proceeding involves the same subject matter." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). There are, however, "certain instances in which the prospect of undue interference with state proceedings counsels against federal

---

[9] For similar reasons, I cannot accept the State's argument that *Feldman* carves out only *facial* challenges to the constitutionality of statutes and not as-applied challenges. Maldonado asserted both facial and "as-applied" challenges to the statute at issue there, *see* 370 F.3d at 956, and yet we squarely held that no portion of his suit was barred by *Rooker-Feldman*. *See supra* at 46–47, 49.

relief," and *Younger* "exemplified one class" of such cases. *Id*. *Younger* established the proposition that "[w]hen there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution." *Id*. Over the years, the Supreme Court "has extended *Younger* abstention" from its initial criminal context to two civil contexts—namely, "state civil proceedings that are akin to criminal prosecutions" and state civil proceedings "that implicate a State's interest in enforcing the orders and judgments of its courts." *Id*. But as we observed in *Applied Underwriters, Inc. v. Lara*, 37 F.4th 579, 588 (9th Cir. 2022), the Court has now "firmly cabined the scope of the doctrine," so that it "applies only" in the aforementioned three categories—namely, pending criminal prosecutions and the two classes of civil proceedings described above. *Id*. at 588; *see also Sprint Commc'ns*, 571 U.S. at 591 (holding that "these three 'exceptional' categories . . . define *Younger*'s scope"). These are sometimes referred to as the "*NOPSI* categories," because the Supreme Court definitively distilled those three categories of *Younger* abstention in *New Orleans Public Service, Inc. v. Council of the City of New Orleans*, 491 U.S. 350 (1989) (*NOPSI*). *See Applied Underwriters*, 37 F.4th at 588; *see also Sprint Commc'ns*, 571 U.S. at 591.

However, "[t]o warrant *Younger* abstention" in a particular federal case, it is not enough that there is a state proceeding that falls into one of the *NOPSI* categories. *Herrera v. City of Palmdale*, 918 F.3d 1037, 1044 (9th Cir. 2019). In addition, "the state proceeding must be (1) 'ongoing,' (2) 'implicate important state interests,' and (3) provide 'an adequate opportunity . . . to raise constitutional challenges.'" *Herrera*, 918 F.3d at 1044 (quoting *Middlesex Cnty. Ethics Comm. v. Garden State Bar*

*Ass'n*, 457 U.S. 423, 432 (1982)).  Moreover, even if a case fits within one of the three *NOPSI* categories and meets all three of the *Middlesex* criteria, a district court still may not abstain under *Younger* unless adjudication of "the federal action would have the practical effect of enjoining the state proceedings." *Herrera*, 918 F.3d at 1044 (citation omitted). "Each of these requirements must be 'strictly met.'" *Rynearson v. Ferguson*, 903 F.3d 920, 925 (9th Cir. 2018) (citation omitted); *see also AmerisourceBergen Corp. v. Roden*, 495 F.3d 1143, 1148 (9th Cir. 2007) (holding that "each element, on its own," must be "satisfied" and a court may not excuse a failure to meet one element by "*balancing* the *Younger* elements").

**B**

The State contends only that the Wallingfords' federal action falls within the third *NOPSI* category, which encompasses "civil proceedings involving certain orders . . . uniquely in the furtherance of the state courts' ability to perform their judicial functions." *Sprint*, 571 U.S. at 78 (quoting *NOPSI*, 491 U.S. at 368).  The State is incorrect.

This third *NOPSI* category has its origins in *Juidice v. Vail*, 430 U.S. 327 (1977), and *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987). *See NOPSI*, 491 U.S. at 368 (citing these two cases as the basis for the third category). In *Juidice*, a judgment debtor (Vail) was held in contempt of court, fined, and ultimately jailed, after he failed to honor a subpoena ordering his attendance at a deposition concerning satisfaction of the judgment against him. *Id*. at 329–30. After paying the fine and being released from custody, Vail and others filed a federal action against the relevant New York state judges, seeking to enjoin "the use of the statutory contempt procedures authorized by New York law" on the

ground that they violated the Fourteenth Amendment. *Id*. at 330. A three-judge district court declined to abstain under *Younger*, but the Supreme Court reversed. *Id*. at 331. Emphasizing that "[t]he contempt power lies at the core of the administration of a State's judicial system," the Court held that the "State's interest in the contempt process" was sufficiently "important" to trigger *Younger* abstention regardless of "[w]hether disobedience of a court-sanctioned subpoena, and the resulting process leading to a finding of contempt of court, is labeled civil, quasi-criminal, or criminal in nature." *Id*. at 335.

In *Pennzoil*, Texaco brought suit in federal court seeking to enjoin enforcement, pending Texaco's appeal in the Texas state courts, of a $13 billion adverse judgment obtained by Pennzoil. 481 U.S. at 4–6. Texaco argued, *inter alia*, that Texas's bonding requirements for staying enforcement of a judgment pending appeal—which Texaco could not meet— "effectively would deny Texaco a right to appeal" in violation of the Fourteenth Amendment. *Id*. at 7. The district court declined to abstain and issued a preliminary injunction against enforcement of the judgment. *Id*. at 8. The court of appeals affirmed, but the Supreme Court reversed. *Id*. at 8–9. Concluding that the "reasoning of *Juidice* controls here," the Court held that *Younger* abstention applied because, as in *Juidice*, "this case involve[s] challenges to the processes by which the State compels compliance with the judgments of its courts." *Id*. at 13–14.

In contrast to *Juidice* and *Pennzoil*, the Wallingfords' suit does not challenge the constitutional validity of any *mechanism* by which the state courts enforce their judgments. Rather than asserting such a challenge to judicial processes for enforcing judgments, the Wallingfords instead

assert a substantive challenge to California statutes that they contend "infringe[]" their Second Amendment right to "keep and bear Arms." *See* U.S. Const., amend II. Accordingly, this case does not fit within the third *NOPSI* category of "'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions,'" a category that is limited to suits that strike at the mechanisms that give a state court the "ability to perform its judicial function." *Sprint*, 571 U.S. at 578–79 (quoting *NOPSI*, 491 U.S. at 368).

This conclusion is confirmed by our decision in *Rynearson*, which rejected the application of *Younger* abstention in a context that bears substantial similarities to this case. In *Rynearson*, a private party (Moriwaki) obtained a "protection order" against Rynearson on the grounds that "Rynearson had stalked, cyberstalked, and unlawfully harassed him." 903 F.3d at 923. While Moriwaki's application for a permanent protection order was still pending, Rynearson filed a federal action against the state Attorney General and the county prosecuting attorney in which he challenged the constitutionality, under the First Amendment, of the Washington "cyberstalking statute," which was one of three different statutes invoked by Moriwaki. *Id.* at 924; *see also Moriwaki v. Rynearson*, 2018 WL 733810, at *5 (Wash. Super. Ct. 2018). After the state court issued the permanent protection order and Rynearson's appeal of that order was pending in state court, the federal district court dismissed Rynearson's federal action under *Younger*. *See Rynearson v. Ferguson*, 2017 WL 4517790, at *1, 5 (W.D. Wa. 2017). We reversed. Addressing the third *NOPSI* category, we held that it was limited to cases that would "interfere in the *procedures* by which states administer their judicial system and ensure compliance with

their judgments."   903 F.3d at 926 (emphasis added). Because Rynearson's federal action did not "'question the *process* by which [state] courts compel compliance'" with their judgments, but instead involved a *substantive* challenge to "the constitutionality of a criminal statute" whose definition of stalking was used in the "stalking protection order statute," that federal action did not fall within *NOPSI*'s third category. *Id*. at 926–27 (quoting *Cook v. Harding*, 879 F.3d 1035, 1041 (9th Cir. 2018) (emphasis added by *Rynearson*)).

Here, just as in *Rynearson*, the Wallingfords assert a constitutional challenge to a state statute that they contend deprives them of a substantive constitutional right, and they do not challenge any aspect of "the *process* by which California courts compel compliance" with their judgments. 903 F.3d at 927 (citation omitted). As a result, this case does not fall with *NOPSI*'s third category, and *Younger* abstention does not apply. *See Applied Underwriters*, 37 F.4th at 590 n.4 (holding third *NOPSI* category is limited to cases "implicat[ing] the regular operation of a state court's judicial system with respect to the processes by which the State compels compliance with the judgements [*sic*] of its courts" (simplified)).**[10]**

\*          \*          \*

For the foregoing reasons, we should reverse the district court's dismissal of this action and remand for further proceedings. To the extent that the majority does otherwise, I respectfully dissent.

---

[10] I therefore have no occasion to address whether the additional requirements for *Younger* abstention are satisfied here. *See supra* at 51–53.